In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-21-00075-CV**
**IN THE INTEREST OF A.Q.H. IV**

**On Appeal from the 317th District Court**
**Jefferson County, Texas**
**Trial Cause No. C-236,966**

**MEMORANDUM OPINION**

Mother appeals from an order terminating her parental rights to Adrian, her four-year-old son.[1] On appeal, Mother argues that the Department of Family and Protective Services failed to introduce legally and factually sufficient evidence to prove her rights to Adrian should be terminated or to prove that terminating them is in Adrian's best interest.[2] Because Mother's issues lack merit, we affirm.

---

[1] We use pseudonyms for the names of the minor and those of his family to protect the minor's identity. Tex. R. App. P. 9.8 (Protection of Minor's Identity in Parental-Rights Termination Cases).

[2] *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), (E), (O), (b)(2).

1

## Background

Mother's history with the Department began years before she had Adrian when, in 2013, she and Adrian's father, *Anthony*, began dating. In 2013, Mother was arrested and charged in Hardin County, Texas with possession or transport of chemicals or equipment used to manufacture methamphetamine.[3] In 2015, Mother pleaded guilty to the indictment that resulted from her 2013 arrest. But the trial court did not pronounce a finding of guilt; instead, the trial court deferred adjudicating Mother guilty and placed her on community supervision for six years.

About four years later, in December 2019, the Department of Family and Protective Services opened a file to address concerns reported to the Department about Anthony's and Mother's alleged use of meth. The children living with Mother and Anthony went to live with relatives or family friends while they were waiting the outcome of the Department's investigation into the report the Department received claiming Adrian was not being supervised properly in the home.[4] In January 2020, during the investigation, Mother gave the Department samples of hers and of Adrian's hair. The samples, when tested at a lab, were both positive for meth.

In late February 2020, the caseworker assigned to Adrian's case found Mother and Adrian at their home while no one else was there. Mother gave the Department

---

[3]*See* Tex. Health & Safety Code Ann. § 481.124.

[4]Mother and Anthony are the biological parents of Adrian. Anthony is not the father of the other children mentioned in the opinion.

a urine sample. The test results from the lab on that sample were positive for meth. Several days after that, Mother submitted an additional specimen of her urine, Adrian's urine, and a specimen of Adrian's hair so the specimens could be tested at a lab. The tests on these samples were all positive for the presence of meth.

In March 2020, the Department obtained an emergency order from the trial court naming the Department as Adrian's temporary sole managing conservator. The emergency order authorized the Department to remove Adrian from Anthony's and Mother's home. In its petition, the Department alleged that the court should appoint the Department as Adrian's sole managing conservator should the circumstances show he is unable to safely be reunified with Anthony and Mother in their home.

In April 2020, the trial court ordered that Anthony and Mother comply with a family service plan, a plan aimed at reunifying the parents with their son. Over the next year, Anthony continued to test positive on many of the tests he took at the Department's request for the presence of meth. But Mother's next six tests over the months leading up to the trial were all negative.[5] Even so, in October 2020, the trajectory of the Department's case changed. That month, police arrested Anthony and charged him with indecency based on conduct involving one of Mother's children named *Becky*, an arrest that resulted following complaints Becky made to

---

[5]The test results on Mother that were negative were based on samples collected in the months of May, August, September, and November 2020, and samples collected in January and March 2021.

3

authorities about Anthony when she told them he had engaged in indecent acts with her over a period of several years. The record shows that, at all material times, Mother has denied knowing about the conduct that Becky described as it relates to Anthony's allegedly indecent conduct. Mother also continued living with Anthony after Becky complained to authorities about Anthony. Based on the testimony the trial court heard in the trial, Becky, Mother's oldest child, was living with Becky's maternal grandmother.[6] The grandmother lives a few miles from Mother's home and is taking care of Mother's other two daughters. Mother, however, claims she still has parental rights to the two children who are currently living with their grandmother.

In April 2021, the Department's claims against Mother and Anthony went to trial. During the trial, three witnesses testified for the Department: (1) Mother; (2) Kyndall Trahan, an investigator employed by the Department; and (3) Stephanie McGlory, the caseworker employed by the Department. Mother called these same three witnesses when she presented her case. Additionally, Mother called the grandmother to testify on Mother's behalf. Anthony did not call any witnesses during the trial. Instead, his attorney told the trial court that Anthony did not plan to call anyone because he had been advised by the attorney who represented him on his

---

[6]*See* Tex. Penal Code Ann. § 21.11(a)(2)(A). The record shows Anthony is awaiting trial on the charges that resulted from complaints Becky made to authorities detailing Anthony's allegedly illegal sexual-related conduct.

criminal case that resulted from Becky's outcry that "he should not testify in this matter."

After the parties rested, the trial court announced that, in the court's view, it is not "appropriate when you have had six children removed to give this mother another chance to be involved in a child who's difficult and having problems to begin with, has been exposed to drugs like he has; and I'm not going to do that."[7] A few days later, the trial court signed the order of termination now before us in Mother's appeal.

Father, on the other hand, did not appeal from the order terminating his relationship with Adrian. The order reflects the trial court terminated Mother's parental-rights to Adrian on three grounds, conduct endangerment, condition endangerment, and for violating the requirements of a court ordered, family-service

---

[7]We assume the trial court was referring to the fact that none of Mother's children have lived with Mother since the March 2020 removal of Adrian from the home. Here, the only evidence in the record addressing a formal removal process is the Department's emergency petition, the petition that resulted in Adrian's removal that month. That said, Mother conceded during her testimony that she does not have parental rights to two of her six children, and she explained that her oldest son was killed while still a child after she allowed him to live with the child's father in the father's home. Even so, Mother also testified she has not lost her parent-child relationships with three of her children as of the trial. And the record does not show whether any additional cases have been filed by the Department addressing Mother's parental-rights to her four other children.

plan.[8] Along with those findings, the trial court's order states that terminating Mother's and Anthony's rights to Adrian is in Adrian's best interest.[9]

## Standard of Review

In Mother's appeal, she argues the Department failed to prove—by clear and convincing evidence—either that she engaged in conduct or created a condition sufficient to endanger Adrian, or to prove that terminating her rights to Adrian is in his best interest. When the Department sues a parent seeking to terminate the parent's relationship with his or her child, the Department must present evidence proving its claims that the parent's rights should be terminated by clear and convincing evidence.[10] Under the Family Code, c*lear and convincing evidence* means enough proof to "produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[11] In addition to securing a finding in its favor on one or more of the twenty-one predicate grounds for terminating the parent's relationship with a child based on the grounds listed in section 161.001(b)(1), the Department must also prove that terminating the parent's relationship with the child is in the child's best interest.[12]

---

[8]*See* Tex. Fam. Code Ann. § 161.001(b)(1)(D) (conduct endangerment), (E) (condition endangerment), (O) (violating the requirements of a court-ordered, family-service plan).

[9]*Id.* § 161.001(b)(2).

[10]*In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

[11]Tex. Fam. Code Ann. § 101.007.

[12]*Id*. § 161.001(b)(1)(A)-(U), (b)(2); *see also In re J.L.*, 163 S.W.3d at 84.

When, as is the case before us here, the parent appeals complaining that there is not enough evidence to support the trial court's conduct endangerment or its condition endangerment findings, we review the evidence admitted during the trial and determine whether it allowed the trial court, acting as a reasonable factfinder, to form a firm belief or conviction the parent endangered the child.[13] In our review, we examine "the evidence in the light most favorable to the [trial court's] finding to determine whether [the court, acting reasonably,] could have formed a firm belief or conviction that its finding was true."[14] In deciding whether the evidence supports the findings challenged in an appeal, we consider whether the inferences the trial court drew from the evidence are "reasonable and logical[.]"[15] And since the trial court, when acting as a factfinder, may reasonably infer facts from proof of other facts if those inferences are also reasonable, we must assume "the factfinder resolved disputed facts in favor of its finding" as to all the findings that are reasonably inferable based on the facts proven during a trial in which a party seeks to terminate one or both of the parent's rights.[16]

---

[13]*In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (holding that in an appeal, the reviewing court must review the parent's issues that complain about the conduct endangerment and condition endangerment findings based on the parent's right to due process).

[14]*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

[15]*In re E.N.C.*, 384 S.W.3d 796, 804 (Tex. 2012).

[16]*In re J.F.C.*, 96 S.W.3d at 266.

Because we assume the trial court made all findings required that are consistent with its verdict, we "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible."[17] Even though we disregard the evidence that a trial court could reasonably disbelieve, we do not disregard it when examining the record to see if it contains enough evidence to support the findings the trial court made terminating a parent's rights.[18] Instead, when conducting a legal-sufficiency review, we examine all the evidence and determine whether the record shows a reasonable factfinder could have terminated the parent's relationship with her child after considering the evidence in the record favoring the trial court's finding and the evidence the factfinder could not have reasonably disregarded or ignored even though it favors some other ruling.[19]

A factual-sufficiency review is similar to a legal-sufficiency review because in reviewing for factual sufficiency we "give due deference" to the trial court's findings when doing so is reasonable based on the direct and circumstantial evidence admitted during the trial.[20] Under the factual-sufficiency standard, we must avoid supplanting the trial court's findings on the cluster of issues relevant to terminating the parent-child relationship with findings of our own.[21] Once again, when

---

[17]*Id.*
[18]*Id.*
[19]*Id.*
[20]*In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (cleaned up).
[21]*Id.*

examining the evidence, we look to the evidence as a whole and decide "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department's] allegations."[22] Frequently, deciding what evidence the trial court could not reasonably ignore and deciding whether that evidence is so significant that the trial court could not have reasonably decided to terminate a parent's relationship with her child turns on the inferences that are reasonably supported by the evidence the parties presented in the trial.[23]

On appeal, Mother complains not only about the sufficiency of the evidence supporting the three predicate findings the trial court relied on to terminate her rights, meaning the conduct endangerment finding, the condition endangerment finding, and the finding that Mother violated the requirements of her family-service plan. In addition to challenging these findings, Mother argues the evidence does not support the trial court's finding that terminating her rights to Adrian is in Adrian's best interest. As to the best-interest finding, Mother notes a presumption exists under the Family Code requiring the factfinder to infer that allowing the parent to maintain his or her relationship with the child is in the child's best interest.[24] Even so, there are other presumptions in the Family Code, including one that requires a trial court,

---

[22]*In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).
[23]*In re J.F.C.*, 96 S.W.3d at 266.
[24]Tex. Fam. Code Ann. § 153.131(b); *see also In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (noting that a "strong presumption" exists favoring keeping a child with its parent).

9

when acting as a factfinder, to presume that a "prompt and permanent placement of the child in a safe environment is . . . in the child's best interest."[25] As is often the case in appeals arising from the trial of a case involving the termination of a parent's rights when the case includes evidence of substance abuse, the question of whether the trial court's decision is reasonable turns on the evidence of nature and degree of the evidence that reveals facts surrounding the parent's abuse of a drug and whether it was reasonable, from that evidence, for the trial court to believe the parent's substance abuse issues have endangered the child.

In her appeal, Mother also challenges the trial court's best-interest finding. In reviewing a best-interest finding, we examine the record for the evidence that addressed the various, non-exclusive factors relevant to a child's best interest as set out by the Texas Supreme Court in *Holley v. Adams*.[26] Often, clear and convincing

---

[25]Tex. Fam. Code Ann. § 263.307(a).

[26]In *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976), the Texas Supreme Court created a non-exclusive list of factors generally relevant to reviewing best-interest findings:
- the child's desires;
- the child's emotional and physical needs, now and in the future;
- the emotional and physical danger to the child, now and in the future;
- the parenting abilities of the parties seeking custody;
- the programs available to assist the party seeking custody;
- the plans for the child by the parties seeking custody;
- the stability of the home or the proposed placement;
- the parent's acts or omissions that reveal the existing parent-child relationship is improper; and
- any excuse for the parent's acts or omission.

evidence sufficient to establish the parent endangered the child by exposing the child to a condition or by placing the child with another who did so is evidence that is highly relevant to the finding that terminating the relationship is in the child's best interest.[27]

Sufficiency of the Evidence—The Condition
Endangerment and Conduct Endangerment Findings

In issues one and two, Mother argues the evidence is legally and factually insufficient to support the trial court's findings of condition endangerment and conduct endangerment, the predicate grounds for termination under subsections 161.001(b)(1)(D) and (E).[28] While similar, the subsections are not identical. Under subsection D, the Department had to prove, by clear and convincing evidence, that Mother knowingly placed or allowed Adrian to remain in conditions or surroundings that endangered his physical or emotional well-being.[29] Under subsection E, the Department needed to prove, again by clear and convincing evidence, that Mother knowingly placed Adrian with a person or allowed him to remain in a condition with that person when the person engaged in conduct that endangered Adrian's well-being.[30]

---

[27]Tex. Fam. Code Ann. § 161.001(b)(1), (2).
[28]*Id.* § 161.001(b)(1)(D), (E).
[29]*Id.* § 161.001(b)(1)(D).
[30]*Id.* § 161.001(b)(1)(E).

11

Both subsections require proof of endangerment. That said, neither subsection required the Department to prove that Mother's conduct resulted in any actual injury to Adrian or to another child. Instead, the focus as to endangerment is whether, given the evidence of the parent's own conduct or that of another with whom the parent left the child, the parent's conduct endangered the child.[31] To prevail on its claim that Mother violated subsections D and E, the Department had to present sufficient evidence to allow the trial court, acting reasonably, to form a firm belief or conviction that Mother engaged in conduct that ran afoul of one or both of those subsections to support a finding in favor of the Department's claim that Mother endangered Adrian.[32]

Here, there is no evidence that Adrian suffered an actual injury from his exposure to meth.[33] Still, the fact he was not actually injured does not mean the trial court could not have reasonably inferred that Mother's ten-year long history

---

[31]*Id*. (emphasis added).

[32]*See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

[33]While the Department proved that meth was detected in Adrian's system when the Department obtained samples from him that tested positive, the only testimony in the record that suggests Adrian suffered any actual physical or mental injury from his exposure to meth at home is the testimony of the caseworker, who attributed Adrian's behavior problems to his exposure. The caseworker's opinion, an opinion of a lay witness, is too speculative to support a finding of an actual injury from the exposure to meth. That's because the record contains no evidence to show the caseworker is qualified to express opinions about what exposure levels to meth result in an actual injury to a child, an opinion that would require training in fields beyond what the record shows the caseworker has had.

involving her episodic use of meth did not establish that Mother knowingly engaged in a course of conduct by choosing to use meth from which a reasonable factfinder could conclude that the parent endangered the child's well-being.[34] That question turns on the inferences available from the evidence the trial court heard in the trial, evidence describing the nature and extent of Mother's historic use of meth. And Mother's history involving her choices to use that substance are relevant regardless of whether she was using meth before Adrian was born.[35]

In an opinion this Court issued last year, we explained that evidence sufficient to reveal a parent's past pattern in abusing a drug is evidence a factfinder may reasonably choose to rely on when deciding whether the parent's substance abuse issues are so prevalent that they endangered the child.[36] In this case, the evidence the trial court relied on to find both condition endangerment and conduct endangerment turn on the evidence describing Mother's historic use of meth. And that evidence shows Mother, over the ten years she has used meth, has suffered several adverse consequences from the choices that she made to use meth.

---

[34]*See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

[35]*Id.*; *In re A.J.H.*, 205 S.W.3d 79, 81 (Tex. App.—Fort Worth 2006, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

[36]*See In re T.B.*, No. 09-20-00172-CV, 2020 Tex. App. LEXIS 8938, at *26 (Tex. App.—Beaumont Nov. 19, 2020, no pet.) (mem. op.) (citing *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, no writ)).

One of the consequences is that Mother was indicted for manufacturing and possession of equipment used to manufacture meth. Mother pleaded guilty to the indictment, and she was placed on deferred adjudication based on her plea. The terms of Mother's probation required that she attend drug counseling. Even so, after completing drug counseling, Mother returned to her past patterns and chose to again use meth. These facts allowed the trial court to infer as a reasonable factfinder that, when Adrian was born, Mother knew Adrian needed a drug-free home free from the uncertainties that exist in homes of parents who have ongoing drug abuse problems involving an illegal substance like meth.

Add to that, the trial court heard evidence that allowed the court to infer that Mother is not the sole managing conservator of two of her five living children. According to Mother, she relinquished her rights to two of her children. While the record is unclear about when that occurred, it is clear that she had relinquished her rights to them prior to the trial conducted to address the Department's claims. And from Mother's testimony, it was reasonable for the trial court to infer that Mother relinquished her parental rights to two of her children in whole or in part due to concerns that various relatives of those children have about Mother's ability to adequately parent a child. In other words, the trial court could infer from the evidence when we examine it in the light that favors the findings that even before

14

the Department removed Adrian in 2020, Mother had suffered serious consequences resulting from the decisions she was making that involved her use of meth.

Around 2015, Mother obtained outpatient treatment in a drug counseling program after the trial court handling her criminal case for manufacturing and delivering the equipment needed to make meth placed Mother on community supervision. But even with counseling, Mother chose to start using meth again even though she was responsible for raising several children who were at that time still living in her home. To be sure, Mother testified she used meth in 2013 before she was arrested and denied that she ever used meth around her children when they were home. Even so, as the factfinder, the trial court was not required to believe Mother's self-serving testimony about her ability to religiously abstain from using meth while her children were around given the fact that both she and Anthony tested positive when the Department opened its investigation into a complaint that Adrian was not being cared for properly in his home.

Business records, admitted in the trial without objection, also support the trial court's findings. The records show that in 2013, the Department opened a file to investigate Mother's alleged use of meth in the home. In some places, the records state that Mother told authorities she was not using meth while her children were home. In other places, however, the records show Mother "admitted to using and manufacturing meth in [the] home, while caring for [her] two children."

15

Mother also testified that, in 2015, she successfully completed a drug-counseling program she was in to comply with her court-ordered community-supervision plan. While Mother claimed she completed the program, neither Mother, nor the Department, introduced any records from the drug-counseling facility into evidence during the trial. As the factfinder, the trial court could have reasonably chosen not to believe Mother's testimony about successfully completing counseling.

Other business records, admitted without objection, show the trial court required that Mother attend two mental health screenings after the Department filed the suit. In March 2020, Mother spoke to a licensed counselor in one of these screenings about her history of using drugs. The records from that facility reveal that Mother has a ten-year history of drug use, use that includes Mother's episodic and repeated use of meth. Those same records show Mother told the counselor she had gotten high or sick from using alcohol or drugs. She also told the counselor that her condition, in the past, had interfered with her ability to care for her children. And Mother told the counselor that due to her problems with illegal drugs, she had experienced problems with family members, friends, people at work, and with the police. On top of that, Mother told the counselor she felt like giving up because things were not getting better.

The counselor diagnosed Mother with amphetamine substance disorder. The counselor also recommended that Mother participate in a residential drug treatment

program. Mother refused, telling the counselor that she preferred to receive her treatment in an outpatient setting. Even so, there are no records in evidence or testimony by a health-care professional that show Mother received treatment at any time in an outpatient or inpatient drug treatment program designed to provide Mother with the skills she needs to abstain from her desire for meth.

In June 2020, Mother attended a second health-care screening. Mother told the licensed counselor she spoke to in June she has a history of using meth and "could use ½ gram/day." Mother's records reflect that Mother told the counselor she was being treated by her physician for her drug problems and that she wanted to stay with him. Mother told the licensed counselor in her second mental health-care screening that she would agree to being treated for substance abuse at that facility should the Department require it.[37] Apparently, the Department did not do so. Moreover, nothing in the record shows the trial court ever ordered Mother to obtain drug treatment to comply with her court-ordered, family service plan.

Looking at the evidence as a whole and deferring to the trial court's right to make reasonable inferences from the available evidence, we conclude the trial court, from all the evidence, could reasonably have formed a firm belief or conviction that Mother's substance abuse problems persist and are longstanding. Admittedly, none

---

[37]The records that the trial court admitted into evidence do not show the Department (or the trial court) required Mother to participate in a program of drug or alcohol treatment after the Department received the counselor's report.

of the six random drug tests in evidence, all of which Mother took after Adrian's March 2020 removal by the Department, are positive for meth. Even so, Mother's drug tests on specimens collected in late January and early February 2020 are positive for meth. In other words, the fact that Mother has shown some ability to control her urge to take meth during the relatively short period that occurred following Adrian's removal and while Mother's rights were at stake does not mean the trial court had to accept the evidence favoring Mother that she now has the skills she needs to provide Adrian with a safe and drug-free home. So while the record certainly contains evidence to support Mother's argument that she now has control over her urges for meth, which is the type of evidence that the trial court could not have reasonably ignored, the trial court was not required to consider the negative drug tests as predictive about whether Mother now has the skills needed to control her desires on an ongoing basis given the evidence of the nature and extent of Mother's substance abuse issues and the fact that Mother failed to provide the trial court with evidence from her physician to show that she has successfully completed a drug-treatment program sufficient to address her history and her ability to parent a pre-school-age child.

The trial court could also consider that denying the Department's claims for termination would cause delay in deciding whether, with appropriate treatment, Mother would be able to acquire the skills she needed to control her inability to stay

18

free of meth. These delays are relevant because Adrian has an interest in a prompt and permanent placement, an interest the trial court could reasonably place above Mother's interest in maintaining the relationship she had with him.

The grandmother's testimony also generally supports the view that Mother now has the skills and willpower she needs to successfully avoid using meth. Even so, we also cannot say it was unreasonable for the trial to reject the grandmother's view about Mother's willpower and skill. Mother has a longstanding substance abuse problem, a problem that has manifested itself over many years. The fact that the trial court heard evidence that shows grandmother is caring for at least two of Mother's other children, children Mother claims she has the rights to possess, shows that even Adrian's grandmother does not believe Mother now has the skills needed to safely parent a child who lives with Mother in Mother's home.

The trial court presiding over this trial has more than two-decades of experience as a judge on a court that specializes in family-law cases. Therefore, it is reasonable for this Court to assume the trial court relied on its considerable experience with cases involving meth given the extensive problem the substance has caused in society. The trial court certainly would have known based on that knowledge that meth is a highly addictive drug, evidence relevant to the trial court's inference that given Mother's history and lack of evidence concerning her treatment, she would inevitably return to her past patterns of conduct as related to using meth.

Comparing Mother's testimony about her past use of meth with the business records in evidence, which also address Mother's history with meth, it was reasonable for the trial court to infer that Mother minimized her desires and attraction to meth when she testified in the trial. The trial court could also reasonably infer by looking to the information in those same records and Mother's testimony that Mother was exaggerating her ability to control her desire to use meth, given the stakes at issue in the trial.

Summing it up: Deferring to the trial court's right as the factfinder and viewing the evidence in the light that favors the trial court's findings, we hold the evidence allowed the trial court to form a firm belief or conviction that Mother engaged in a voluntary and deliberate course of conduct or placed Adrian with a person—Anthony—another meth user, whose conduct endangered Adrian's physical and emotional well-being. To be sure, the negative tests for meth tend to support Mother's claim she has not taken meth since the Department removed Adrian from his home. That evidence is entitled to significant weight, as it cannot reasonably be ignored.[38] But still, acting as the factfinder, the trial court was free to reject Mother's claim that her recent conduct is more predictive of her future conduct than were her past patterns in using meth. In other words, Mother's relatively short history of staying drug free for a year is not negated by Mother's ten-year history

[38]*In re C.V.*, 531 S.W.3d 301, 305 (Tex. App.—Amarillo 2017, pet. denied).

that shows she used meth given the risk Mother's history creates as related to predicting whether she engaged in a course of conduct that allowed the trial court to conclude she endangered Adrian.[39]

We hold the evidence is legally and factually sufficient to support the trial court's verdict as to the trial court's condition and conduct endangerment findings. For that reason, we overrule Mother's arguments in her first and second issues claiming the evidence is insufficient to support the endangerment findings. Because the evidence supports the findings on endangerment, we need not address Mother's third issue, which argues the evidence is legally and factually insufficient to support the trial court's finding that Mother violated the requirements of her court-ordered, family plan.[40]

Sufficiency of the Evidence–the Best-Interest Finding

In Mother's last issue, issue four, she argues the evidence is legally and factually insufficient to support the trial court's best-interest finding. When the trial occurred, Adrian was four-years old. The record contains testimony that Adrian, at

_____

[39]*In re J.O.A.*, 283 S.W.3d at 346.

[40]*See* Tex. R. App. P. 47.1 (explaining that the court's opinion must address those issues necessary to the court's final disposition of the appeal); Tex. Fam. Code Ann. § 161.001(b)(1)(O) (termination of parental rights based on violations of provisions of a court-ordered family service plan); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014) ("proof of any one ground will support a judgment terminating parental rights" when the evidence shows that terminating the parent-child relationship is in the child's best interest).

the time the Department removed him from his home, was not well socialized. According to testimony presented by the Department's witnesses, Adrian initially had problems with his behavior, problems the caseworker explained were more pronounced than usual for a three- or four-year-old child. According to the caseworker, the problems she observed in Adrian's behavior resulted from his exposure to meth. The supervisor in charge of supervising Adrian's case testified that Adrian was not very verbal when the Department removed him from his home. She explained that when he was removed, he could only speak a few words.

According to the caseworker's testimony, Adrian's problems with his behavior improved significantly after the Department put him into foster care. The caseworker explained that Adrian still has outbursts on occasion, but he can now follow directions. The caseworker also testified that Adrian is more verbal than when the Department removed him. According to her, Adrian is now "just a totally different kid." In the caseworker's opinion, it is in Adrian's best interest for the trial court to terminate Adrian's parents' rights.

We note that the Department failed to develop testimony to show whether there are any current prospects for Adrian's adoption. And the Department presented nothing to show how long the Department expects to leave Adrian in a foster home. The Department did not call Adrian's foster parents or his court-appointed special advocate (CASA) to testify in the trial. But the trial court admitted a report from the

CASA without objection. The report, which was prepared shortly before the trial, reflects that Adrian's CASA thought that terminating Mother's rights to him is in Adrian best interest. In the report, the CASA recommended that the trial court name the Department as Adrian's permanent managing conservator and allow Adrian to remain "in [his] current placement." Adrian's attorney ad litem advised the trial court that while he recognized the testimony showed Mother had made a great deal of effort to maintain her relationship with Adrian, he thought "it would be a bad, bad risk to have [Adrian] returned to her."

To Mother's credit, the evidence in the trial shows that she substantially complied with the material requirements of her family plan. And the evidence shows she has a strong bond with Adrian, as she has visited him while he has been in a foster home as many times as allowed. Adrian's grandmother's testimony concerning Adrian's best interest also favors Mother. The grandmother testified that she is willing to allow Adrian to live with her rather than Mother if the trial court were to accommodate her request. The grandmother explained that by allowing Adrian to live with her, he could continue to develop his existing bond with Mother's other children, the children living with the grandmother in the grandmother's home. The grandmother explained that Mother currently visits the children living with grandmother frequently. She also helps bathe them and feed them because she lives a few miles away. According to the grandmother, her plan would be better than

23

requiring Adrian to remain in foster care. The grandmother also testified that she believes the children can safely be around their mother because to the grandmother's knowledge, Mother has not used meth for over a year. Grandmother testified that she thinks Mother is now "an excellent example of everything she needs to be since she's gotten away from [Anthony]."

When Mother testified, she explained she has not smoked meth for over a year, is willing to "do anything that anybody asked to be able to get my kids back[,]" has done everything she can to improve her parenting skills, and she felt she deserved a chance to maintain her relationship with her youngest son. According to Mother, she took up meth again about three years after Adrian was born. Since then, she said, she has used meth three times. Mother wanted the trial court to name the grandmother as Adrian's managing conservator while allowing Mother to retain her possessory rights.

Here, as we explained when resolving Mother's first two issues, the trial court could have formed a firm believe or conviction that Mother used meth to the detriment of the children living in the home in 2020 when the Department removed Adrian from her care. While Mother denied that she used meth frequently before Adrian was taken from her, the business records before the trial court allowed it to infer that Mother has a ten-year history of using meth, a history that suggests more than an infrequent use. And while Mother has had some of her children temporarily

24

removed from the home more than five years earlier based on Mother's prior experiences involving the presence of chemicals and equipment used to manufacture meth, Mother placed her urge for that substance above the interests of Adrian when she chose to continue using meth even though she had a child younger than five living in her home. The trial court did not have to ignore the fact that Adrian tested positive for meth in deciding whether Mother's use of meth endangered Adrian based on the conditions where he lived. And while Mother has five living children, none were living with her when the Department's case was tried, a fact the trial court emphasized when it explained why the court decided to terminate Mother's rights.

Mother offered four excuses for her choice to use meth. According to Mother, she (1) exercised bad judgment, (2) was "losing [her] relationship [with Anthony[,] (3) "had no income[,]" and (4) "had nowhere to go[.]" But there is little reason to suggest the trial court acted unreasonably in concluding these types of problems are likely to persist. At trial, the testimony shows Anthony is awaiting trial on the charges that resulted from Becky's allegations claiming he engaged in indecent conduct, conduct that occurred over a period of years and while Mother and Anthony were living in the home. Mother testified that currently, she is unemployed and lives on social security disability based on a diagnosis classifying her as bi-polar. Whether Adrian was better off in a foster home or by allowing Mother to maintain her relationship was a contested issue in the trial. As the factfinder, it was up to the trial

25

court on this record to decide what evidence it should believe and based on that, to decide whether the evidence clearly established that a decision to terminate Mother's rights would be in Adrian's best interest.[41]

Deferring to the trial court's role as the sole arbiter of the facts, we hold the record contains legally and factually sufficient evidence to support the trial court's best-interest finding.[42] We overrule Mother's fourth issue.

Conclusion

Based on the Court's resolution of Mother's issues, the final order terminating Mother's parent-child relationship with her son Adrian is

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on July 19, 2021
Opinion Delivered September 30, 2021

Before Golemon, C.J., Horton and Johnson, JJ.

---

[41]*See In re J.O.A.*, 283 S.W.3d at 346 (explaining "the factfinder, not the appellate court, is the sole arbiter" on matters of the credibility of the witnesses and their demeanor); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (stating the trier of fact "may believe one witness and disbelieve others").

[42]*See* Tex. Fam. Code. Ann. §§ 161.001(b)(2), 263.307(a); *see also In re J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72.